# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 1:21-CR-414 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES DAILEY, | ) | |
| | ) | |
| Defendant. | ) | GOVERNMENT'S TRIAL BRIEF |
| | ) | |

The United States of America, by and through its attorneys, Michelle M. Baeppler, First Assistant United States Attorney, Patrick Burke and Segev Phillips, Assistant United States Attorneys, hereby submits the following Trial Brief.

## Factual Background

On February 4, 2021, members of the Cleveland Division of Police, Gang Impact Unit observed a white male and two other men briefly enter and exit a house they believed to be a drug premises. After a brief time at the house, the trio left, with the white male driving a rented white 2020 Dodge Charger within the area of W. 50th Street and Clark Avenue. Detectives attempted a traffic stop for a traffic violation, but the vehicle fled from officers at a high rate of speed, weaving through oncoming traffic. Detectives elected not to pursue the vehicle. The next evening, detectives located the same white 2020 Dodge Charge parked at gas pump at Q's Gas Station located at 4332 Clark Avenue. The gas station was located on Clark Avenue, several blocks away from where detectives had seen and tried to stop the vehicle before fleeing down W.25th street over the Pearl Road bridge. Detectives observed the same white male they saw the night before, later identified as James Dailey, exiting the gas station and getting into the driver's

side of the car. Detectives approached the vehicle and ordered the occupant out, in order to prevent another chase and investigate the vehicle and identify the occupant. While approaching the vehicle parked at a gas pump, Detectives observed in plain view through the windows and open door baggies of suspected controlled substances. Dailey was removed from the vehicle, placed under arrest, and was read his Miranda rights. He waived his rights and agreed to speak to officers. Dailey was searched incident to arrest and officers found a bag of crack cocaine in his right pocket of his jeans and $1,131 cash in the front left pocket.

Dailey's arrest and post-Miranda interview was captured on body camera. During his arrest, Dailey admitted to possessing the drugs found in his pants pocket and the car. He told officers he "operates" on the west side of town. Dailey initially denied leading officers on a high speed chase the night before, but ultimately admitted he was in the area, saw the detective's vehicles, and ultimately fled over the Pearl Road bridge. Dailey confirmed he was with two other men the night before and had seen the officers before fleeing. During his interview, Dailey is asked where he does his drug trafficking and if what he had on him was because he had "re-upped" (re-up is a slang term used for when a drug dealer replenishes their supply of narcotics.)

Detective: Did you just re-up or what? Or this what you were rolling to sling with?

Dailey: That's just what I had, bro.

Detective: You just re-upped?

Dailey: I just had that on me, man.

Detective: Ok, where you been selling that over here then, you say primarily west, or east, or west or what? What is it, what's the deal?

Dailey: Ah, I'm from the west side, bro.

Detective: So you sling over here?

Dailey: Can I get another cigarette, please, man

Detective: Do you… Answer my question, man.

Dailey: I just told you, I'm answering.

Detective: You said you're from the west, so you sling over this way or what?

Dailey: This, this, where I, you know what I'm saying, do whatever I do, bro. I do it over here, man. I'm not admitting to doing nothing, I'm just saying.

The drugs were sent for laboratory analysis, and confirmed by the Cuyahoga County lab to be methamphetamine, heroin, cocaine base, pills containing fentanyl, cocaine, and a substance that was a mix of heroin, acetyl fentanyl, fluorofentanyl, and fentanyl. The methamphetamine was then sent to the DEA lab, which did a purity analysis of the methamphetamine and found it to be 77.3 grams at a 69% purity, for a total weight of 53.3 grams, +/- 5%.

Dailey was taken into custody and housed for a brief period of time at the Cuyahoga County Jail. He made several telephone calls on a monitored, recorded line wherein he made admissions as to the possession of the controlled substances and the events that led up to his arrest.

## Joint Preliminary Statement

The parties will separately file a joint preliminary statement.

## Stipulations

The parties have not agreed to any stipulations at this time. The government has sent/will send proposed stipulations to the Defendant regarding drug chemistry and his criminal history. It

is the government's understanding that defense counsel will be conferring with Defendant regarding the proposed stipulations soon. The parties will file the final language of any agreed-to stipulations as soon as possible.

## Jury Instructions

The United States will file the agreed-to instructions separately.

## Voir Dire

The United States did not have any additions or objections to the court's previously provided voir dire questions.

## Anticipated Legal Issues

**A.  Government's Proposed Expert Testimony**

The United States will call the following expert witnesses at trial:

1. <u>Heather Pilch-Cooper, Drug Chemist with the Cuyahoga County Regional Forensic Science Laboratory</u>:  Ms. Pilch-Cooper has tested the controlled substances seized in this case and will testify (unless a stipulation is agreed to) regarding her testing and conclusions regarding the substances presented to her.

2. <u>Justin Tone-Pah-Hote, Drug Chemist with the DEA North Central Laboratory</u>:  Mr. Tone-Pah-Hote has tested the methamphetamine seized in this case, specifically the purity of the substance, and will testify (unless a stipulation is agreed to) regarding his testing and conclusions regarding the substances presented to him.

3. <u>Alex Gumucio, TFO with the Federal Bureau of Investigation</u>: By education, training, and experience, TFO Gumucio is familiar with common operating procedures of drug traffickers, street value of controlled substances, and distribution quantities. He will testify as a fact witness regarding his observations of Dailey's arrest, and as an opinion witness regarding the methods of drug traffickers, including distribution quantities.

The United States anticipates that these witnesses will testify within their areas of expertise on the subject matters listed above.  *See* Fed. R. Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue"); *United States v. Schneider*, 704 F.3d 1287, 1291 (10th

Cir. 2013) (holding that medical expert may opine on the cause of death, including when the cause of death is an element or otherwise a matter of dispute at trial).

### B. Use of Evidence and 404(b) Notice

Though a separate notice will be/has been filed regarding these issues, the United States anticipates introducing evidence that is admitted under Rule 404(b). In particular, the United States anticipates introducing testimony regarding Defendant's flight from police the night before his arrest. Rather, it is to show his knowledge, intent, and lack of mistake.

### C. Government Representative and Separation of Witnesses

The United States respectfully requests that this Court issue a separation-of-witness order pursuant to Federal Rule of Evidence 615 and designates TFO Alex Gumucio as its representative in this case to be present at counsel table throughout the trial. His presence in the courtroom during trial is essential to the presentation of the United States' case. *See* FED. R. EVID. 615(b) (specifically excluding from a sequestration order "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney"); FED. R. EVID. 615(c) (providing an additional exception for essential witnesses).

### D. Admissibility of Recording and Transcripts

The United States will introduce audio recordings including body camera videos, and recorded jail phone calls made by the defendant. A transcript of the pertinent sections of the jail calls will be offered as a jury aid to be used while the conversations are being played. The

government may seek to admit the transcripts as exhibits for the jury.[1] The Sixth Circuit reviewed the standards for admission of "composite" tape recordings and transcripts in the cases. *United States v. Scarborough*, 43 F.3d 1021, 1024 (6th Cir. 1994) and *United States v. Segines*, 17 F.3d 847, 854 (6th Cir. 1994).[2] As noted in *Scarborough* at 1024:

> "It is well settled that the admission of tape recordings at trial rests within the sound discretion of the trial court." *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983). In order to be admissible the district court must determine whether the tapes are "audible and sufficiently comprehensible for the jury to consider the contents." *Robinson*, 707 F.2d at 876. The district court abuses his discretion only "where the unintelligible portions of a tape recording are so substantial that the recording as a whole is rendered untrustworthy." *United States v. Scaife*, 749 F.2d 338, 345 (6th Cir. 1984).

The admission of audio recordings in evidence is subject to the rules of evidence generally. Accordingly, a proper foundation must be laid for their admission, and the recordings must be relevant and not privileged. Where practical, the original recordings should be used, pursuant to Fed. Rule of Evidence 1002, and when telephone conversations are involved, evidence should be offered as to the correct telephone number, as required by Fed. Rule of Evidence 901(b)(6). *United States v. Watson*, 594 F.2d 1330, 1335 (10th Cir.), *cert. denied,*

---

1     Even absent a stipulation by the parties, the Sixth Circuit has repeatedly affirmed the validity of this procedure, so long as there is a preliminary foundation as to the preparation and accuracy of the transcripts. *United States v. West*, 948 F.2d 1042, 1044 (6th Cir. 1991). This is so, especially when accompanied by a cautionary instruction that the recording, and not the transcript, is the evidence to be considered by the jury. *See* Pattern Criminal Jury Instructions, U.S. Sixth Circuit District Judges Association (2019), Section 7.17. In the instant case, a reviewing agent has compared the transcripts with the recorded conversations and will testify that the transcripts are a fair and accurate transcription of the various conversations.

2     A "composite" recording is one in which only relevant portions of a conversation are presented with the non-pertinent portions of the conversation being removed. The government may admit only excerpts of some recordings but will make clear when the recordings have been excerpted.

*Brown v. United States*, 444 U.S. 840 (1979). However, under Fed. Rule of Evidence 1003, a duplicate is admissible to the same extent as an original unless there is a genuine question about the authenticity of the original or it would be unfair to admit the duplicate. The Sixth Circuit has discussed what the necessary foundation for a tape recording is:

> While we have not in our prior cases indicated precisely what foundation is necessary to admit audiotapes where the challenge is to their admission generally, other circuits have alternately held that the district court must be satisfied that the recording is accurate, authentic, and generally trustworthy, that simply required is proof that the tape recording accurately reflects the conversation in question, or that a proper foundation may be established in two ways: a chain of custody… or alternatively, other testimony could be used to establish the accuracy and trustworthiness of the evidence.

*United States v. DeJohn*, 368 F.3d 533, 542 (6th Cir. 2004) (citations and quotation marks omitted). The United States intends to authenticate the recording through the testimony of the officers involved in Dailey's arrest and interview, who later monitored his jail calls.

### E. Self-Authenticating Records

The United States hereby notifies Defendant and this Court, pursuant to Federal Rules of Evidence 902(11), 902(13), 902(14), of its intent to introduce certified records as self-authenticating records, including his Certification of Incarceration from the Ohio Department of Rehabilitation and Correction.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FRE 901(a). "This burden [under Rule 901] is slight." *United States v. Demjanjuk*, No. 1:99CV1193, 2002 WL 544622, at *21 (N.D. Ohio Feb. 21, 2002),

*supplemented*, No. 1:99CV1193, 2002 WL 544623 (N.D. Ohio Feb. 21, 2002), and *aff'd*, 367 F.3d 623 (6th Cir. 2004). "[T]here need only be a *prima facie* showing, to the court, of authenticity, not a full argument on admissibility." *Id.*; *see also United States v. Fluker,* 698 F.3d 988, 999 (7th Cir. 2012 ("Only a *prima facie* showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury." ); Hon. Paul Grimm, Gregory Joseph & Daniel Capra, *Best Practices for Authenticating Digital Evidence*, pp. 2-3, West Academic Publishing (2016) (describing the roles of the trial court and jury).

"Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court." *United States v. Thomas*, 921 F.2d 277 (6th Cir. 1990) (citations omitted). "The only requirement is that there has been substantial evidence from which they could infer that the document is authentic." *Id.*; *see also United States v. Carriger*, 592 F.2d 312, 316 (6th Cir. 1979) (concluding "that the district court erred in requiring further authentication of the promissory notes").

Federal Rule of Evidence 902 addresses "evidence that is self-authenticating." FRE 902. "No extrinsic evidence of authenticity" is required for this evidence "to be admitted." *Id.* Courts in the Sixth Circuit regularly admit self-authenticating evidence pursuant to Rule 902 without any witness testimony. *See, e.g., Gjokaj v. United States Steel Corp.,* 700 F. App'x 494, 502 (6th Cir. 2017) (finding "a business record certified by a qualified witness" to be "self-authenticating" under FRE 902(11)).

Federal Rules of Evidence 902(13) and 902(14) state that certain types of certified digital records and data are self-authenticating, removing any need to provide extrinsic evidence of authenticity (such the testimony of a live witness) at a trial or hearing. In enacting FRE 902(13)

and (14), the Rules Committee noted that "as with the provisions on business records in Rules 902(11) and (12), the Committee has found that the expense and inconvenience of producing a witness to authenticate an item of electronic evidence is often unnecessary." FRE 902(13), Advisory Committee's Note (2017).

The government has produced or will produce to Defendant the certificates of authenticity for the relevant records. These records are self-authenticating.

## Estimate of Trial Length

The United States anticipates that its case-in-chief should take no longer than one full day.

Respectfully submitted,

MICHELLE M. BAEPPLER
First Assistant United States Attorney

By: /s/ Patrick Burke
Patrick P. Burke (OH: 0082609)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3689
(216) 522-7499 (facsimile)
Patrick.Burke@usdoj.gov